## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHON HUMBERT, | ) |
| | ) |
| Plaintiff, | ) Case No. 19-cv-9081 |
| | ) |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| GANNETT CO. INC., JOHN JEFFRY LOUIS, | ) |
| PAUL BASCOBERT, JOHN E. CODY, | ) |
| STEPHEN W. COLL, DONALD FELSINGER, | ) |
| LILA INBRAHIM, LARRY KRAMER, | ) |
| DEBRA A. SANDLER, CHLOE SLADDEN, | ) |
| and ROBERT J. DICKEY, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Jonathon Humbert, by his undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Gannett Co., Inc. ("Gannett" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of Gannett by New Media Investment Group, Inc. ("New Media").

2. On August 5, 2019, Gannett, New Media, Arctic Holdings LLC ("Intermediate

1

Holdco"), and Arctic Acquisition Corp. ("Merger Sub"), entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into Gannett, with Gannett continuing as the surviving corporation and an indirect wholly owned subsidiary of New Media (the "Proposed Transaction").

3.    Pursuant to the terms of the Merger Agreement, Gannett's shareholders will be entitled to receive (1) 0.5427 shares of New Media common stock for each share of Gannett common stock they own (the "Exchange Ratio"), and (2) $6.25 in cash, without interest (the "Cash Consideration" and together with the "Exchange Ratio," the "Merger Consideration").

4.    On or about August 29, 2019, in order to convince Gannett's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading S-4 Registration Statement with the SEC, and on September 27, 2019, the Defendants authorized the filing of a materially incomplete and misleading Amended S-4 Registration Statement with the SEC (the "Registration Statement") in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.    In particular, the Registration Statement contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Gannett's financial advisors, Greenhill & Co., LLC ("Greenhill") and Goldman Sachs & Co. LLC ("Goldman Sachs" and, together with Greenhill, the "Financial Advisors") regarding the Proposed Transaction.

6.    The Proposed Transaction is expected to close in the Fourth Quarter of this year and the special meeting of the Company's shareholders to vote on the Proposed Transaction is scheduled to occur on November 14, 2019.  Therefore, it is imperative that the material information that has been omitted from the Registration Statement is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Gannett's public common stockholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Gannett's common stock trades on the New York Stock Exchange

("NYSE"), which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Gannett common stock.

12.     Defendant Gannett, a public company incorporated under the laws of Delaware, is an innovative, digitally focused media and marketing solutions company with its principal executive office located at 7950 Jones Branch Drive, McLean, Virginia 22107. Gannett common stock is traded on the NYSE under the ticker symbol "GCI."

13.     Individual Defendant John Jeffry Louis ("Louis") is, and has been at all relevant times, the Chairman of the Company's Board of Directors.

14.     Individual Defendant Paul Bascobert ("Bascobert") is the Company's President and Chief Executive Officer and a director of the Company and was appointed to this position on August 5, 2019, the same day the Proposed Transaction was announced.

15.     Individual Defendant John E. Cody ("Cody") is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Stephen W. Coll ("Coll"), is and has been at all relevant times, a director of the Company.

17.     Individual Defendant Donald Felsinger ("Felsinger") is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Lila Ibrahim ("Ibrahim") is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant Larry Kramer ("Kramer") is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant Debra A. Sandler ("Sandler") is, and has been at all relevant times, a director of the Company.

21.     Individual Defendant Chloe Sladden ("Sladden") is, and has been at all relevant times, a director of the Company.

22.     Individual Defendant Robert J. Dickey ("Dickey") was the Company's President and Chief Executive Officer until his retirement from the Company on May 7, 2019 and was a director of the Company until May 7, 2019.

23.     The Defendants identified in paragraphs 13 through 22 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

24.     Gannett is a digitally focused media and marketing solutions company.  Registration Statement, 1.  Gannett owns ReachLocal, Inc. (a digital marketing solutions company), the USA TODAY NETWORK (made up of USA TODAY and 109 local media organizations in 34 states in the U.S. and Guam, including digital sites and affiliates), Newsquest (a wholly owned subsidiary operating in the United Kingdom with more than 150 local media brands), WordStream, Inc. (a self-service, software-as-a-solution digital marketing services company), and SweetIQ (a digital marketing company).  *Id.*

25.     Gannett has grown considerably during the past few years.  For example, since 2015, Gannett has acquired: (i) Texas-New Mexico Newspapers Partnership (a media company with print and digital publishing operations in Texas, New Mexico, and Pennsylvania), (ii) Romanes Media Group (a media company with print and digital publishing operations in Scotland, Berkshire, and Northern Ireland), (iii) Journal Media Group (a media company with print and digital publishing

operations in Milwaukee, Wisconsin), (iv) North Jersey Media Group (a media company with print and digital publishing operations in Woodland Park, New Jersey), (v) ReachLocal (a digital marketing solutions firm in Woodland Hills, California), (vi) SweetIQ (a digital marketing solutions firm in Montreal, Canada), and (vii) WordStream (a provider of cloud-based software-as-a-service solutions in Boston, Massachusetts).  Registration Statement, 20.

26.    In light of these acquisitions and its recent financial performance, Gannett had exceptional long-term prospects prior to the announcement of the Proposed Transaction.  As the Company announced in its May 1, 2019 Press Release entitled *Gannett Reports First Quarter Results*:

> "We had a solid start to 2019, with better than expected results across print advertising and circulation revenues as well as improved Adjusted EBITDA in the first quarter," said Robert J. Dickey, president and chief executive officer. "We also experienced robust new client acquisition in March and April that we believe will contribute to improved digital advertising and marketing services revenues in future quarters. Importantly, we are continuing to make progress on transitioning to a digitally-led product and revenue model, which we are confident will enhance growth and drive shareholder value."
>
> "We were pleased with our cost performance this quarter as our ongoing initiatives to enhance productivity and efficiency enabled us to reduce same store operating expenses 10% year-over-year," said Ali Engel, senior vice president and chief financial officer. "We are focused on continuing to make strategic investments to support our digital transformation, while closely managing our expense base to maintain profitability amid current print revenue trends."

27.    Indeed, in light of these excellent long-term prospects, the Company received interest from several potential counterparties in the months leading up to the announcement of the Proposed Transaction.

28.    Thus, the Proposed Transaction comes at a time when Gannett's recent and future success was not fully reflected by its share price.  The Proposed Transaction will "compensate" Gannett stockholders with an amount of stock in the combined company that fails to adequately compensate them for the intrinsic value of their shares.

29.    Despite Gannett's intrinsic value and growth prospects, the Individual Defendants

are agreeing to a merger that deprives Gannett's public stockholders of the ability to partake in the Company's individual growth and instead dilutes the value of their Gannett stock with an inadequate mix of cash and less intrinsically valuable New Media stock. The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration while Company insiders receive millions of dollars in severance payments and accelerated stock unit vesting.

**Background of the Merger and the Announcement of the Proposed Transaction**

30.    On December 5, 2018, the Company announced that Dickey would be retiring from his position as President and Chief Executive Officer of the Company, but would be staying on until as late as May 7, 2019 to assist in the Company's transition to a new President and CEO.

31.    On January 14, 2019, Gannett received an unsolicited, nonbinding proposal from MNG Enterprises, Inc. ("MNG"), a Denver-based newspaper publisher, to acquire Gannett in an all-cash merger for $12.00 per share (the "MNG Proposal"). Registration Statement, 49. After receiving the MNG Proposal, Gannett engaged Greenhill to act as financial advisor and Skadden, Arps, Slate, Meagher & Glom LLP ("Skadden") to act as outside legal counsel in connection with the MNG Proposal and other potential strategic transactions. Registration Statement, 50.

32.    Immediately after MNG publicly announced the MNG Proposal on January 14, 2019, "certain members of the Gannett Board and management were contacted immediately, and again in the weeks that followed, by representatives of a publicly-traded strategic company, which is referred to as Company A, expressing interest in a potential combination with Gannett." Registration Statement, 50. Representatives of Gannett and Greenhill were also "contacted by representatives of serval other parties also potentially interested in transactions with Gannett" during the days and weeks

following the announcement of the MNG Proposal.  *Id.*

33.     On January 16, 2019, Michael Reed ("Reed"), New Media's Chief Executive Officer, contacted Dickey regarding the MNG Proposal, indicating that "New Media may be interested in discussing a potential negotiated strategic transaction involving Gannett," and further indicating that "New Media could offer a more attractive alternative to MNG."  Registration Statement, 50.  Dickey responded that Gannett "was still in the process of evaluating the MNG Proposal and its strategic options generally."  *Id.*

34.     On January 31, 2019, the Board held a meeting with Gannett senior management and Greenhill and Skadden at which it "discussed, among other matters, Gannett's stand-alone plan, the MNG Proposal (including the value, closing risks and perceived credibility of the proposal) and other potential opportunities for Gannett."  Registration Statement, 50.  Management "presented an update on Gannett's financial plan and discussed with the Gannett Board management's projections for Gannett over the next five years and the assumptions underlying the projections in detail."  *Id.*  After Greenhill "presented and discussed with the directors various financial analyses," the Gannett Board "unanimously determined to reject the MNG Proposal, requested that Greenhill perform an additional, in-depth analysis of the various potential strategic options presently available to Gannett and authorized the engagement of a second financial advisor."  *Id.*  The Registration Statement does not: (i) state whether this was a regularly-scheduled meeting or a special meeting, (ii) identify the "other potential opportunities for Gannett" that were discussed including a potential acquisition by New Media, (iii) state whether the management projections that were discussed were prepared in connection with the MNG Proposal or pre-existed the MNG Proposal, or (iv) identify the "various financial analyses" that Greenhill presented and discussed with the Board and the results of these analyses.

35.     On February 1, 2019, Gannett engaged Goldman Sachs to act as financial co-advisor

with Greenhill in connection with the MNG Proposal and "other strategic alternatives, including other potential transactions." Registration Statement, 50. On February 4, 2019, Gannett publicly announced that it was rejecting the MNG Proposal, "noting that the proposal undervalued Gannett and was not credible." *Id.* The Registration Statement does not state whether Goldman Sachs had provided financial advice in connection with the MNG Proposal when Gannett announced this rejection, and further does not state Gannett's basis for determining that the MNG Proposal was "not credible."

36.      On February 19, 2019, the Board held a meeting with Gannett senior management, Greenhill, Goldman Sachs, and Skadden present at which "Goldman Sachs presented a preliminary illustrative financial analysis of Gannett on a stand-alone basis, which had been conducted independently of the financial analysis that Greenhill had prepared and presented at the Gannett Board's January 31, 2019 meeting." Registration Statement, 51. After the Board "expressed its openness to having a dialogue with other parties who contacted Gannett regarding a potential transaction," the Board "determined not to proactively reach out to other potential transaction counterparties at that time." *Id.* The Registration Statement does not: (i) state whether this was a regularly-scheduled meeting or a special meeting, (ii) identify the types of analyses performed in Goldman Sachs "preliminary illustrative financial analysis of Gannett on a stand-alone basis," the results of those analyses, or clarify whether the fact that the analysis was "conducted independently" of Greenhill's financial analysis meant that Goldman Sachs and Greenhill were basing their analyses on different projections and inputs, or (iii) state the reason the Board determined not to proactively reach out to other potential counterparties.

37.      On February 26, 2019, the Board held another meeting, at which it discussed the various potential counterparties that had expressed interest in a strategic transaction with Gannett and learned that one of the parties that had previously expressed interest had indicated that it was no

longer interested.  Registration Statement, 51.  The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

38.     On March 5, 2019, the Board held another meeting, at which it discussed "various topics relating to the MNG Proposal and proxy contest, as well as various potential strategic alternatives," including as a standalone company and in "a potential strategic transaction with new Media or Company A, among others."  Registration Statement, 52.  The Board directed Gannett's management and advisors to continue discussions with Reed and also authorized Gannett's management and advisors to continue discussions and begin conducting non-public due diligence with respect to a potential acquisition of Company A.  The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

39.     On March 10, 2019, Reed indicated "his thoughts with respect to the mix of stock and cash, including that he anticipated New Media could offer approximately 50% cash," and, although "no specific price was discussed," Reed further "communicated his belief" that "New Media could potentially exceed MNG's $12.00 per share proposal."  Registration Statement, 52.  Reed also indicated "his thoughts on certain social issues, including the leadership, name and headquarters of the combined company."  *Id.*  The Registration Statement does not state the substance of Reed's "thoughts" on the "leadership, name and headquarters of the combined company."

40.     On March 11, 2019, Gannett and Company A entered a mutual non-disclosure agreement ("NDA") with a standstill agreement that terminated after the other party entered an alternative agreement with another counterparty.  Registration Statement, 52-53.

41.     On March 21, 2019, Gannett held a meeting "to discuss a number of topics, including matters relating to the MNG Proposal and proxy contest, the company's ongoing CEO search, and

the potential transaction opportunities with New Media and Company A, among other potential strategic options." Registration Statement 53. "The directors authorized the entry into a mutual NDA with New Media and the commencement of high-level non-public due diligence with respect to a transaction, focused initially on the potential achievable synergies." *Id.* The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

42.    On March 29, 2019, Gannett and New Media entered into a mutual NDA with a standstill agreement that terminated after the other party entered an alternative agreement with another counterparty. Registration Statement, 53.

43.    On April 12, 2019, the Board held a meeting "to further discuss Gannett's potential strategic options, including potential transactions with Company A or New Media." Registration Statement 53. "The directors expressed support for submitting a letter to Company A that would describe Gannett's interest and timeline in potentially pursuing a transaction and also requested a follow up meeting to further discuss the proposed transaction with New Media." Registration Statement, 54. The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

44.    On April 18, 2019, the Board held another meeting "to continue to discuss a potential transaction with New Media." Registration Statement, 54. After "representatives of Greenhill and Goldman discussed with the directors the potential terms of a possible proposal from New Media and presented an updated preliminary illustrative financial analysis of a potential transaction with New Media," the Board "expressed support for a more specific transaction proposal from New Media in the near future. The Gannett Board also provided input on the draft letter that was proposed to be sent to Company A, as discussed at their prior meeting." *Id.* The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential

counterparties at this meeting.

45.     On April 24, 2019, Gannett sent a letter to Company A's CEO, "indicating Gannett's desire to postpone any further discussions regarding a possible transaction until after Gannett's annual meeting."  Registration Statement, 54.  Following this letter, "substantive engagement between Gannett and Company A regarding a transaction did not occur."  The Registration Statement does not state why Gannett "desired to postpone any further discussions" with Company A at the same time it was requesting "a  more specific transaction proposal from New Media," and does not state whether its letter to Company A advised Company A that Gannett was continuing to engage in negotiations with another potential counterparty while it was postponing further discussions with Company A.

46.     On May 1, 2019, Reed met with the "then-leading candidate for the Gannett CEO position to discuss strategic issues and digital transformation."  Registration Statement, 54.  The Registration Statement does not state whether the "then-leading candidate" was Bascobert, the person ultimately appointed to the position the same day that the Proposed Transaction was announced.

47.     On May 6, 2019, the Board held a meeting at which it "discussed further the potential strategic alternatives, including continuing as a stand-alone company with a new CEO, a possible transaction with Company A or a possible transaction with New Media."  Registration Statement, 55.  Following the discussion, the Board directed Greenhill and Goldman Sachs to request a written proposal from New Media.  *Id.*  The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

48.     On May 14, 2019, New Media "submitted a non-binding written proposal to acquire Gannett at a proposed price of between $11.50 and $12.00 per Gannett share of common stock, with approximately 60% of the consideration to be paid in cash and 40% to be paid in New Media common stock, and with New Media stockholders being expected to own a majority of the combined company."  Registration Statement, 56.  The Proposal "indicated that it would equate to $16.00 to

$16.50 per share in value when the impact of $200 million of achievable synergies is taken into account," and further "indicated that New Media would look to Gannett senior management to help populate the combined company's ranks" and that "New Media was open to discussing board representation for the combined company," and also "expressed a willingness to consider utilizing Gannett's headquarters and brand for the combined company."  Registration Statement, 56-57.  The Registration Statement does not state whether New Media's positions with respect to the combined company's management, directorship, headquarters, and branding were consistent with the "thoughts" that Reed expressed on March 10, 2019.

49.    On May 15, 2019, the Board held a meeting at which it discussed New Media's proposal and representatives of Greenhill and Goldman Sachs "provided a preliminary illustrative financial analysis of the proposal."  Registration Statement, 57.  The discussion continued in a meeting of the Board on May 16, 2019.  *Id.*  The Board instructed Greenhill and Goldman Sachs to advise New Media that "the price remained open but needed to be higher than $12.00 per share," and further that the Board "believed that their leading CEO candidate should be the CEO of the combined company and that Mr. Reed should become executive chairman of the combined company."  *Id.*  The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting, and also does not identify the Board's "leading CEO candidate."

50.    On May 21, 2019, the Board held another meeting to discuss "next steps with respect to the New Media proposal and consideration of that possible transaction as compared to Gannett's stand-alone alternative with a new CEO."  Registration Statement, 57.  The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

51.    On May 22, 2019, Louis and Reed discussed New Media's proposal "and the two

discussed issues primarily relating to post-closing board composition, the potential role for Gannett's leading CEO candidate, and the commitment to digital transformation." Registration Statement, 58.

52.    On May 23, 2019, the Board held another meeting "to continue its discussion of next steps with respect to the New Media proposal and consideration of that transaction as compared to Gannett's stand-alone alternative with a new CEO." Registration Statement, 58. The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

53.    On May 31, 2019, the Board held another meeting at which Gannett "management discussed with the director's financial performance trends for 2019 and an updated sensitivity analysis for the remainder of 2019." Registration Statement, 58. Greenhill and Goldman Sachs discussed "their respective preliminary illustrative financial analyses in the context of a potential transaction with Company A" and "in the context of a potential transaction with new Media," noting that "further specific price and exchange ratio negotiations had not yet occurred beyond New Media's original proposal" but that they had "emphasized to New Media that the price must be higher than $12.00 per share." The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

54.    On June 10, 2019, the Board held another meeting. Registration Statement, 59. After receiving "presentations from its two leading CEO candidates," the Board discussed "potential strategic alternatives facing Gannett, including a stand-alone path, or possible transactions with Company A or New Media." Registration Statement, 59. The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

55.    On June 13, 2019, "Louis contacted Mr. Reed and Gannett's then-leading CEO candidate, Paul Bascobert, encouraging them to meet." Registration Statement, 58. Reed met with

Bascobert on June 17, 2019, and again on June 26, 2019.  Registration Statement, 60.  The Registration Statement does not state whether Bascobert was the Company's leading CEO candidate prior to receiving "presentations from its two leading CEO candidates" on June 10, 2019.

56.     On June 14, 2019, Cravath, Swaine & Moore LLP ("Cravath"), on behalf of New Media, distributed a draft merger agreement to Skadden, on behalf of Gannett.   Registration Statement, 60.  On June 25, 2019, Skadden sent revisions to the draft merger agreement to Cravath, and also "provided Cravath with a draft exhibit regarding certain governance matters pertaining to the combined company, including board size and composition, supermajority voting requirements for certain board matters, certain board committee composition matters and the treatment of certain key executive roles."  *Id.*

57.     On June 26, 2019, the Board held another meeting, where they discussed "the potential transaction, the meaningful premium being offered in relation to Gannett's recent share prices, the de-risking available to stockholders through the cash component of the consideration, the potential upside available to stockholders through the stock component of the consideration, Gannett management's estimate of the synergies potentially achievable in the transaction, the enhanced scale of the combined entity, the likely complementary strengths of Gannett and New Media in both the digital and traditional print businesses and a pro forma financial profile of the combined entity," as well as "other considerations, including the risk associated with the stock component of the transaction, the leverage of the combined company, the additional expense and potential complications presented by the Existing Management Agreement, closing risks and the possibility of a negative impact of the transaction on operating performance and retention during the period between signing and closing."  Registration Statement, 60.  "The Gannett Board provided guidance and direction to the advisors with respect to certain key open points in the negotiation affecting the value of the transaction to Gannett's stockholders, including the transaction price and a potential

amendment of the Existing Management Agreement." *Id.*   The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting and further does not state the substance of the Board's "guidance and direction" with respect to the transaction price.

58.    On July 18, 2019, *The Wall Street Journal* published an article, indicating that Gannett and New Media were in advanced talks.   Registration Statement, 63.   Following this article, Gannett's stock price "jumped" from a closing price of $7.90 on July 18, 2019 to a closing price of $9.46 on July 19, 2019.   The Registration Statement does not state how or why this information was conveyed to *The Wall Street Journal*, and does not state whether this information was provided by representatives acting on behalf of New Media, Gannett, or both.

59.    On July 23, 2019, the Board held a meeting at which it discussed "key open points in the negotiation, including the price and exchange ratio, the relative allocation of cash and stock consideration, the proposed amendment to the Existing Management Agreement, whether Gannett could continue its regular quarterly dividend between signing and closing, the efforts required with respect to obtaining regulatory clearances, the termination fees payable by Gannett and New Media under certain circumstances, the termination date after which either Gannett or New Media could terminate the merger agreement, certain interim operating covenants, and certain governance issues, including issues relating to the size and composition of the combined company's board and the role for Gannett's CEO if Gannett were to hire a CEO by the time the transaction is announced." Registration Statement, 63.   Representatives of Greenhill and Goldman Sachs "also reported that New Media had identified unexpected cash obligations at closing," and that these "unexpected cash obligations" had caused New Media to "change its view on the stock/cash allocation of the offer," with the current view being that stock "would comprise approximately 45% of the consideration" rather than 34% of the consideration as discussed at the June 26, 2019 Board meeting. Registration

Statement, 63-64.  The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

60.    On July 30, 2019, the Board held a meeting at which it "discussed certain key open issues in the transaction impacting the value of the transaction to Gannett stockholders, including the price and exchange ratio, the relative allocation of stock and cash consideration, whether Gannett could continue its regular quarterly dividend between signing and closing, and the proposed amendment to the Existing Management Agreement, among others."  Registration Statement, 65. The Registration Statement does not discuss whether the Board revisited the possibility of proactively reaching out to other potential counterparties at this meeting.

61.    On August 3, 2019, Louis indicated to Messrs. Tarica and Sheehan, representatives of New Media's Transaction Committee "that the Gannett Board would require a higher price and indicated that for certain members of the Gannett Board, the implied $12.00 per share price" was unacceptable, Tarica and Sheehan asked whether consideration with an implied valuation of $12.05 per share price would be acceptable, and Louis responded that "he was confident that the Gannett Board would agree to an implied price of $12.10 per share."  Registration Statement, 67.  The Registration Statement does not state whether Louis indicated which "certain members of the Gannett Board" found the $12.00 per share price unacceptable and further does not state why Louis was "confident" that these members would agree to consideration worth $12.10 per share.

62.    Later on August 3, 2019, Louis and Tarica subsequently indicated that their respective boards "were prepared to agree on a per share price of $6.25 in cash and 0.5427 shares of New Media common stock, which reflected an overall implied price of $12.05 based on the volume weighted average trading prices of New Media common stock for the five consecutive trading days ending on August 2, 2019, and an overall implied price of $12.06 based on the closing price per share of New Media common stock on August 2, 2019."  Registration Statement, 67.

63.   On August 4, 2019, the Board held a meeting at which it received oral opinions of its Financial Advisors regarding the fairness of the transaction, from a financial point of view, and subsequently "(1) determined that the merger agreement is advisable and in the best interests of Gannett and its stockholders, (2) adopted resolutions approving the execution, delivery and performance by Gannett of the merger agreement, (3) adopted resolutions recommending that Gannett stockholders approve the merger agreement proposal and (4) directed that the merger agreement be submitted for consideration by Gannett stockholders at the Gannett special meeting," and also approved of the appointment of Bascobert as a director of the Company and the Company's CEO.  Registration Statement, 68.  The Registration Statement does not state whether or not the Board "determined" to adopt these positions based on unanimous agreement from the Board members.

64.   On August 5, 2019, "each of New Media, Gannett, Intermediate Holdco and Merger Sub executed and delivered the merger agreement," and Gannett and New Media contacted the NYSE to inform of the impending announcement of the merger, and thereafter issued a joint press release to announce the Proposed Transaction:

*NEW MEDIA INVESTMENT GROUP TO ACQUIRE GANNETT*

.

Monday, August 5, 2019 2:40 pm EDT

**Two Leading Media and Marketing Solutions Companies**
**Align to Preserve and Enhance Quality Journalism**

*Creates the leading U.S. print and digital news organization with deep local roots and nationwide scale*

*Michael Reed to remain Chairman of the Board of Directors and Chief Executive Officer;*
*Alison Engel expected to become Chief Financial Officer;*
*Paul Bascobert, newly appointed Chief Executive Officer of Gannett, will become Chief Executive Officer of the combined company's operating subsidiary*

*Strategically-aligned leadership committed to expanding and promoting digital offerings and high-quality journalism*

*Anticipated run-rate cost synergies of $275 - $300 million annually,
unlocking meaningful shareholder value*

*New Media's external management agreement to be amended at closing and terminated in
2021*

NEW YORK & MCLEAN, Va.--(BUSINESS WIRE)--New Media Investment Group Inc.
("New Media") (NYSE: NEWM) and Gannett Co., Inc. ("Gannett") (NYSE: GCI)
announced today that New Media and Gannett have entered into a definitive agreement (the
"Merger Agreement") pursuant to which New Media will acquire Gannett for a combination
of cash and stock (the "Merger").

Under the terms of the Merger Agreement, shareholders of Gannett will receive $6.25 in
cash and 0.5427 of a New Media share for each Gannett share they hold, representing total
consideration of $12.06 per Gannett common share based on New Media's closing stock
price as of August 2, 2019, and a premium of approximately 18% to the five-day volume-
weighted average price of Gannett shares as of that date. After the close of the transaction,
Gannett shareholders will hold approximately 49.5% of the combined company and New
Media shareholders will hold approximately 50.5%.

The Merger brings together the portfolios of two leading local newspaper companies, and
includes USA TODAY, Gannett's flagship brand, and its more than 160 brands in the U.K.,
which will significantly expand the existing USA TODAY NETWORK. This combination
will create a broad network of talented, experienced journalists poised to deliver unique and
award-winning content for local communities and national audiences. The breadth and depth
of each company's digital offerings will make the combined company a leading digital
media player. Additionally, the joining of New Media's UpCurve and GateHouse Live
businesses with Gannett's ReachLocal and WordStream subsidiaries will provide multiple,
diversified marketing and revenue solutions and position the combined company as a
stronger partner for advertisers and small businesses ("SMBs") in the markets served.

With strategically-aligned leadership and significant scale of operations, the Merger will
accelerate the combined company's digital transformation. The Merger also affords an
opportunity to realize run-rate cost synergies of $275 - $300 million annually across the
combined company in a judicious manner, while continuing to invest in newsrooms.

"We believe this transaction will create value for our shareholders, greater opportunities for
our employees, and a stronger future for journalism. Gannett is an innovative, digitally-
focused media and marketing solutions company with well-known brands worldwide.
Uniting our talented employees and complementary portfolios will enable us to expand our
comprehensive, hyperlocal coverage for consumers, deepen our product offering for local
businesses, and accelerate our shift from print-centric to dynamic multimedia operations. We
are honored to become a part of Gannett's storied history and a steward of their strong media
properties into the future. We are committed to delivering significant synergies in a
thoughtful manner, consistent with our shared goals for the business," said Michael Reed,
New Media Chairman and Chief Executive Officer.

"The Gannett Board unanimously determined that this combination with New Media is in
the best interests of Gannett shareholders, customers, audiences, and employees, providing
significant and immediate value, as well as the ability to benefit from the upside potential of

19

the combined company," said J. Jeffry Louis, Chairman of the Gannett Board of Directors. "We see numerous opportunities to leverage the combined company's enhanced scale and financial strength to continue to drive growth in the digital future. Importantly, we have found in New Media a strong partner and cultural fit for Gannett as we continue delivering on a shared commitment to journalistic excellence for the communities we serve."

The companies will co-host a call to discuss the transaction and second quarter earnings on August 5, 2019 at 4:15 p.m. Eastern Time. Please visit the Investor Relations section of either company's website (www.newmediainv.com or www.gannett.com).

Compelling Strategic & Financial Benefits

Enhanced scale. New Media and Gannett share a strategic vision, and the combined company's significantly enhanced scale of operations will enable it to realize this vision more rapidly, while generating value for shareholders and benefits for employees and other stakeholders. The Merger will create a leading local and national media company with 263 daily media organizations across 47 states and Guam and USA TODAY, reaching more than 145 million unique visitors every month, as measured by Comscore. This scale will meaningfully enhance the combined company's financial profile by leveraging nationwide reach and local presence to expand and deepen relationships with consumers and businesses. As a result, we will accelerate the growth of the combined company's digital revenue through innovative customer experiences and new marketing solutions for businesses, while creating an expansive journalism network with the resources required to deliver unique and award-winning content.

Accelerate digital strategy. New Media and Gannett believe that a digital transformation of the newspaper industry is vital to the preservation of journalism, and the Merger will accelerate the combined company's digital transformation. The breadth and depth of each company's digital offerings will make the combined company a leading digital media player and a stronger partner for advertisers and SMBs.

Significant synergies. New Media and Gannett share a commitment to rationalizing costs as the media industry evolves, while continuing to invest in product development, training for newsrooms and understanding readers' needs. The Merger is anticipated to result in run-rate cost synergies across the combined company of $275 - $300 million annually, unlocking meaningful shareholder value. The majority of synergies is expected to be realized within 24 months of closing and result from the increased scale of the new organization, sharing of best practices, leveraging existing infrastructure, facility rationalization and other judicious cost reductions.

External Management Agreement. New Media and FIG LLC, an affiliate of Fortress Investment Group (the "Manager"), have amended the external management agreement to set the termination date as December 31, 2021. The amendment, as described in more detail below, also reduces the incentive fee rate payable to the Manager for the remainder of the term.

Leadership and Governance

The combined company's management team will be led by New Media's current Chairman and Chief Executive Officer, Michael Reed. Alison Engel, Gannett's current Chief Financial

Officer, is expected to serve as the Chief Financial Officer of the combined organization upon closing. Gannett's newly appointed Chief Executive Officer, Paul Bascobert, will become Chief Executive Officer of the combined company's operating subsidiary. The rest of the combined company's senior executive team, which is expected to be composed of highly experienced leaders from both companies, will be announced at a later date.

Mr. Bascobert was the President of XO Group from 2016 until its sale to Permira Equity in 2019. During his tenure, he helped lead the company's transformation from a media company to a marketplace business. Prior to XO, Mr. Bascobert led sales, service, and marketing for the Local Businesses segment at Yodle from 2014 until 2016. Before that, he spent four years at Bloomberg LP as President of Bloomberg Businessweek from 2010 until 2014, in addition to serving as Chief Operating Officer of the Media Group from 2011 to 2014. Mr. Bascobert joined Bloomberg from Dow Jones & Co. where he was Senior Vice President of Operations from 2006 until 2007 and Chief Marketing Officer from 2007 until 2009.

The combined company's Board of Directors will have nine members, including Mr. Reed as Chairman, five independent directors from New Media, and three independent directors from Gannett. Mr. Kevin Sheehan, who currently serves as New Media's Lead Director, will serve as the combined company's Lead Director. New Media has been actively engaged in a director search and expects to announce two additional independent directors prior to closing. The companies believe that diversity can strengthen board performance and New Media is actively searching for women and other candidates with diverse backgrounds and experiences.

After the closing of the Merger, both New Media and its operating subsidiary GateHouse, will be rebranded and operate under the "Gannett" brand. The combined company will be headquartered in McLean, Va., with a continued corporate presence in existing locations.

<u>Financing</u>

New Media expects to fund the cash portion of the Merger consideration through a combination of cash on the balance sheet and a new term loan facility (the "Term Loan") to be funded at closing pursuant to a binding commitment from funds managed by affiliates of Apollo Global Management, LLC (NYSE:APO), a global alternative investment manager with approximately $312 billion in assets under management, as of June 30, 2019, and deep experience in supporting media companies. The Term Loan, which will be used to retire existing financial debt obligations of both companies and to fund the cash component of merger consideration, will be a five-year senior secured term loan facility in an aggregate principal amount of $1.792 billion. The Term Loan will be freely pre-payable without penalty, and the combined company is expected to have a strong cash-flow profile that will permit aggressive deleveraging. Total pro forma leverage at closing of the Merger is expected to be approximately 3.5x LTM As Adjusted EBITDA, before run-rate synergies, and 2.3x including run-rate synergies. Target net leverage within two years of closing is expected to be below 1.75x.

/

/

Dividend

Initially, the combined company is expected to have an annual dividend of $0.76 per share. It is expected that the dividend will be increased over time as synergies are realized and leverage is reduced.

External Management Agreement

Concurrent with the entry into the Merger Agreement, New Media and the Manager have agreed to amend the Management and Advisory Agreement dated as of March 6, 2015 (such amendment, the "Amended Management Agreement"), pursuant to which the Manager provides a management team (including the Chief Executive Officer) and other professionals who provide services to New Media.

The Amended Management Agreement, which will become effective upon the closing of the Merger, provides for the following key changes:

1. Establishes a termination date of December 31, 2021, for the Manager's services in lieu of annual renewals of the term;

2. Reduces the incentive fee rate from 25% to 17.5% for the remainder of the term;

3. Reduces by 50% the number of options that would otherwise be issuable in connection with the issuance of shares as consideration for the Merger, and imposes a premium on the exercise price;

4. Eliminates the Manager's right to receive options in connection with future equity raises; and

5. Eliminates certain payments otherwise due at or after the end of the term.

In exchange, New Media will issue to the Manager upon closing approximately 4.2 million shares of New Media common stock. The Manager is restricted from selling these shares until the expiration of the Amended Management Agreement, or otherwise upon a change in control and certain other extraordinary events. New Media will also grant the Manager approximately 3.2 million options with an exercise price of $15.50, a 45% premium to the closing price of New Media common stock on August 2, 2019. These options become exercisable upon the first trading day immediately following the first 20 consecutive trading day period in which the closing price of New Media's common stock (on its principal U.S. national securities exchange) is at or above $20 per share, and also upon a change in control and certain other extraordinary events.

Upon expiration of the term of the Amended Management Agreement, the Manager will cease providing external management services to New Media, and the Manager will no longer be the employer of the person serving in the role of Chief Executive Officer of the combined company (the "Internalization").

Timing and Approvals

New Media formed the Transaction Committee to review, evaluate, and negotiate the Merger and the Internalization (including the terms of the Amended Management Agreement). The Merger has been unanimously approved by the New Media Transaction

Committee and by the Boards of both companies. The New Media Transaction Committee separately, and unanimously, approved the Amended Management Agreement.

The Merger is expected to close by the end of 2019, subject to the satisfaction of customary closing conditions, including receipt of regulatory clearances and approval by the shareholders of each company.

Advisors

Credit Suisse is serving as financial advisor to New Media, and Cravath, Swaine & Moore LLP is serving as principal legal counsel. New Media's Transaction Committee retained Jefferies LLC as its independent financial advisor, and Wilson Sonsini Goodrich & Rosati as its legal counsel.

Greenhill & Co., LLC and Goldman Sachs & Co. LLC are serving as financial advisors to Gannett, and Skadden, Arps, Slate, Meagher & Flom LLP and Nixon Peabody LLP are serving as legal counsel.

**The Preclusive Deal Protection Devices**

65.     To the detriment of the Company's public shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

66.     Section 7.04 of the Merger Agreement ("No Solicitation by the Company") is a restrictive "no-shop" provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

67.     Section 7.04(a) of the Merger Agreement strictly prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations

68.     Sections 7.04(e) of the Merger Agreement requires the Board to provide New Media with written notice of any Company Acquisition Proposal within forty-eight (48) hours of its receipt. Sections 7.04(c) and (d) likewise require the Board to provide prior written notice of at least five (5) business days of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with New Media following New Media's receipt of the notice, so that New

Media has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Company Acquisition Proposal ceases to be a Company Superior Proposal.

69.     In addition, the Merger Agreement provides that the Company will be required to pay to New Media a termination fee of $45,000,000.00 with respect to any termination under the No-Shop provisions of the Merger Agreement.

70.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company, and further restrain the Company's public stockholders' ability to disapprove the Proposed Transaction.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

71.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Registration Statement Omits Material Information**

72.     On or about September 27, 2019, in order to convince Gannett's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Registration Statement with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

73.     The special meeting of Gannett stockholders to vote on the Proposed Transaction is scheduled for November 14, 2019.  The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Registration Statement misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed

Transaction.

74.     Specifically, the Registration Statement omits two types of material information: (i) information regarding the background of the transaction and the Individual Defendants' potential conflicts of interest, and (ii) information that renders the Company's Financial Advisors' fairness analysis materially false, misleading, or incomplete.

**A. The Registration Statement Omits Material Information Regarding the Background of the Transaction**

75.     The Registration Statement identifies numerous Board meetings but fails to disclose which of these meetings were regularly scheduled meetings and which of these meetings were special meetings that were called with the specific purpose of discussing potential strategic transactions. This information is material to shareholders deciding whether to vote in favor of the Proposed Transaction because a reasonable investor would wonder whether the Merger Consideration adequately values the Company when the Company did not actual solicit proposals and the only alternative acquisition proposal that the Company received (the MNG Proposal) was all but dismissed out of hand.

76.     The Registration Statement states that Greenhill and Goldman Sachs prepared financial analyses based on Company Projections as early as January 31, 2019 and February 19, 2019, respectively, and further states that the Board considered some, or all, of these analyses in rejecting the MNG Proposal as purportedly undervaluing the Company and not being credible, but the Registration Statement fails to: (i) disclose whether these Company Projections were prepared before or after the Board's receipt of the MNG Proposal, (ii) identify the financial analyses that were performed and considered, (iii), disclose the results of those analyses, and (iv) disclose what factors the Board considered in determining that the MNG Proposal was "not credible." This information is important to shareholders considering whether to vote in favor of the Proposed Transaction because the Board did not perform a market check and did not receive any proposals other than the MNG

Proposal. Moreover, although the Board relied on the Financial Advisors' analyses in determining that the MNG Proposal undervalued the Company, the Board ultimately resolved to accept Merger Consideration in an amount that was similar to the $12.00 per share cash offer in the MNG Proposal.

77.     The Registration Statement states that the Board discussed the possibility of not reaching out to potential counterparties other than the ones that reached out to Gannett at its January 31, 2019 meeting but fails to disclose the reason that the Board determined not to do so, and further fails to disclose when, if ever, the Board revisited this possibility and the reasons that did not subsequently reach out to other potential counterparties, especially as it became clear that Gannett appeared to be the only serious potential counterparty that was both interested in acquiring the Company and involved in discussions regarding such an acquisition. This information is important to shareholders considering whether to vote in favor of the Proposed Transaction because the Board did not perform a market check and did not receive any proposals other than the unsolicited MNG Proposal and the financial analyses that the Company's Financial Advisors performed is a "pale substitute" for a market check. *See, Barkan v. Amsted Industries, Inc.*, 567 A.2d 1279, 1287 (Del. 1989).

78.     The Registration Statement states that Reed indicated "thoughts on certain social issues" including the leadership, name and headquarters of the combined company" on March 10, 2019, but fails to disclose the substance of Reed's thoughts on these issues. This information is material to shareholders deciding how to vote on the Proposed Transaction because New Media's May 14, 2019 acquisition proposal was open (and indeed, agreed) to many of Gannett's preferred positions on these issues and Reed indicating a willingness to defer to Gannett's preferred position on these issues as early as March 10, 2019 may have provided reasons for the Individual Defendants to steer negotiations towards New Media and away from other potential counterparties, and may have been the reason the Individual Defendants resolved not to proactively reach out to other potential

counterparties at all.

79.     The Registration Statement states that Gannett sent a letter to Company A on April 24, 2019 that indicated that Gannett desired to "postpone any further discussions regarding a possible transaction," but fails to disclose whether Gannett expressed reasons for this desire.  This information is material to shareholders deciding whether to vote in favor of the Proposed Transaction because the Company failed to conduct a market check and this letter effectively killed discussions with Company A, the only other potential counterparty that became seriously involved in discussions with the Company.

80.     The Registration Statement references a "then-leading candidate" for the Gannett CEO position on May 1, 2019 and May 15, 2019 but fails to disclose whether this "then-leading candidate" was Bascobert or someone else.  This information is material to shareholders deciding how to vote on the Proposed Transaction because Reed met with this candidate on May 1, 2019, the Board received presentations from its "two leading CEO candidates" on June 10, 2019, Bascobert was Gannett's leading CEO candidate on June 13, 2019, and Bascobert's appointment as the Company's new President and CEO occurred simultaneously with the Board's adoption of the Merger Agreement.

81.     The Registration Statement states that *The Wall Street Journal* published an article regarding Gannett and New Media's "advanced talks" but fails to disclose how or why this information was conveyed to *The Wall Street Journal*.

82.     The Registration Statement states that the Board "determined" to adopt the Proposed Transaction and approved the appointment of Bascobert as a director of the Company and the Company's CEO on August 4, 2019 but fails to disclose whether this determination was unanimous. This information is material to shareholders deciding how to vote on the Proposed Transaction because whether certain Board members opposed the Proposed Transaction is unquestionably

relevant to how a shareholder would vote.

**B.    The Registration Statement Omits Material Information Regarding the Financial Advisors' Fairness Analysis**

83.    The Registration Statement also omits material information regarding the Company's Financial Advisors' Fairness Opinion and the various valuation analyses that the Company's Financial Advisors performed to render the opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Registration Statement does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

84.    With respect to the management projections, the Registration Statement fails to disclose material information. With respect to these financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

85.    Notably, the Registration Statement fails to provide all of the financial projections provided by the companies' management and relied upon by the Company's Financial Advisors in rendering their opinions.  Specifically, the Registration Statement does not provide any cash flow projections for the *pro forma* combined company.

86.     Further, the Registration Statement fails to disclose Gannett's standalone financial projections for the following items: (i) Depreciation & amortization, (ii) Taxes (or tax rate), (iii) Stock-based compensation expense, (iv) Changes in net working capital, (v) Capital expenditures, and (vi) Any other line items used in the calculation of unlevered cash flow.  As the Company did not perform a market check, the failure to disclose these projections is unquestionably materially misleading to the Company's public shareholders who would be unable to determine whether the free cash flow projections were based on reasonable assumptions and expectations.

87.     With respect to Greenhill's *Selected Precedent Transactions Analysis* beginning on Page 106, the Registration Statement does not state the reasons Greenhill considered in determining to: (i) not base its analysis on any transactions involving the acquisition of marketing solutions companies, (ii) select a cutoff date for inclusion of June 2014, and (iii) reach its "judgment" that these transaction were "relevant for its analysis."  Moreover, the Registration Statement also fails to disclose: (iv) the Enterprise Valuation of the company involved in each transaction, and (v) whether "N/A" in each instance refers to the multiples not being available or the multiples not being applicable, possibly because EBITDA was negative as the acquired company was not profitable. Without this information, it is impossible for shareholders to determine if the selected range of multiples effectively undervalues the Company relative to its peers.  *E.g., In re PNB Hldg. Co. S'holders Litig.*, 2006 Del. Ch. LEXIS 158, at *96 n.125 (Del. Ch. Aug. 18, 2006) (rejecting comparable companies analysis where the "comparable publicly-traded companies all were significantly larger than [the subject company], with one having total assets of $587 million as compared to [the subject company's] assets of $216 million").

88.     Regarding Greenhill's *Selected Comparable Company Analysis* beginning on Page 107 and Page 110, the Registration Statement fails to adequately disclose the rationale and basis that Greenhill used in selecting the companies included in the analysis.  Further, the Registration

Statement fails to disclose the Enterprise Valuation of each company involved in the analysis, and further fails to disclose whether "N/A" in each instance refers to the multiples not being available or the multiples not being applicable, possibly because EBITDA was negative as the acquired company was not profitable.  Without this information, it is impossible for shareholders to determine if the selected range of multiples effectively undervalues the Company and/or overvalues New Media relative to their peers.

89.    Regarding Greenhill's *Illustrative Value Creation Analysis* beginning on Page 112, the Registration Statement fails to adequately disclose the factors Greenhill used in employing "its professional judgment and experience" to select its range of estimated enterprise value to adjusted EBITDA multiples for 2020.

90.    Regarding Goldman Sachs' *Selected Publicly Traded Companies Analysis* beginning on Page 117, the Registration Statement fails to adequately disclose the criteria Goldman Sachs used in selecting the four companies that it included in its analysis and fails to disclose the Enterprise Values for each of the selected companies.  As Goldman Sachs not only selected just four companies but also excluded one of those companies, The McClatchy Company ("McClatchy"), in calculating the median multiples for its analysis, it is absolutely essential that investors know the vital information about each company that was selected and further understand the factors Goldman Sachs deemed "certain operations that for purposes of analysis may be considered similar" so that investors know whether Goldman Sachs improperly included outlier companies or erroneously excluded companies that were in fact similar.  Indeed, notwithstanding the disclosure that Goldman Sachs excluded McClatchy "due to its limited equity value and liquidity," the Registration Statement contains no information that substantiates Goldman Sachs' opinion that McClatchy had "limited equity value and liquidity" and Greenhill did not exclude McClatchy from its analysis.  *See, e.g., In re PNB*, 2006 Del. Ch. LEXIS 158, at *96 n.125.

91.     Regarding Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* beginning on Page 118, the Registration Statement fails to adequately disclose Goldman Sachs's rationale and basis for selecting a range of terminal year multiples of enterprise value to terminal year adjusted EBITDA of 4.5x to 6.5x and further fails to provide a full sensitivity table.  The failure to provide the results of the analysis in a sensitivity table and to adequately and fully disclose Goldman Sachs' rationale for selecting a 4.5x terminal year multiple renders the Registration Statement false and misleading because the lowpoint of the range of terminal year multiples that Goldman Sachs selected (4.5x) is well below the actual trading multiples observed for Gannett and the median trading multiples observed by Goldman Sachs in its *Selected Publicly Traded Companies Analysis* (6.5x to 7.3x).  As the valuation based on the high-point of the terminal year multiple range (illustrative present value of $15.13 per share) suggests the Merger Consideration valued at $12.13 per share is inadequate, it is impossible to determine whether the *Illustrative Discounted Cash Flow Analysis* actually supports a finding that the Merger Consideration is fair without the full disclosure of Goldman Sachs' rationale and basis for selecting a terminal year multiple range with a lowpoint of 4.5x and a sensitivity table summarizing the Company's valuation as a function of the assumed terminal year multiple.

92.     Regarding Goldman Sachs' *Selected Precedent Transactions Analysis* beginning on Page 120, the Registration Statement does not state the factors Goldman Sachs considered in determining to: (i) not base its analysis on any transactions involving the acquisition of marketing solutions companies, (ii) select a cutoff date for inclusion of November 2014, and (iii) reach its "professional judgment" that the transaction involved a company "similar to certain of Gannett's results, market size and service profile."  Moreover, the Registration Statement also fails to disclose: (iv) the Enterprise Valuation of the company involved in each transaction.  Without this information, it is impossible for shareholders to determine if the selected range of multiples effectively undervalues

the Company relative to its peers.  *E.g., In re PNB*, 2006 Del. Ch. LEXIS 158, at *96 n.125.  Further,

in light of the failure to fully disclose Goldman Sachs' rationale and basis for selecting the companies

included, the failure to summarize the results of the analysis by anything other than range (i.e., $7.61

to $15.39) renders the Registration Statement false and misleading because without knowing whether,

for example, Trinity Mirror plc is actually an outlier that should not have been included in selecting

the range of multiples, it is impossible to determine whether the results of the *Selected Precedent*

*Transactions Analysis* actually support a finding that the Merger Consideration is fair.

93.    Regarding Goldman Sachs' *Premia Paid Analysis* beginning on Page 120, the

Registration Statement fails to disclose the actual individual transactions analyzed and the premia

paid in each transaction or even summarize the premia paid by anything other than median and

average.  The Registration Statement further fails to disclose whether and, if so, how Goldman Sachs

accounted for the possibility that part of a precedent transaction premium had already been baked

into the "background" stock price prior to the announcement of a transaction, for example due to a

"jump" in stock price that occurred after a company announced that it was anticipating a merger

before any merger was, in fact, finalized.  *See, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483

(S.D.N.Y. 1994) ("The fact that Columbia stock jumped 25 percent when Columbia finally

announced in September 1989 that it was engaged in acquisition discussions with an unannounced

suitor is convincing evidence that whatever 'acquisition expectations' were previously built into

Columbia stock before this date were less than fully confident ones.").  Indeed, although Goldman

Sachs calculates the illustrative premium here by comparing it to Gannett's *undisturbed* trading price,

the Registration Statement fails to disclose whether, and if so how, Goldman Sachs attempted to

account for the possibility of price disturbances in the precedent transactions and further fails to

disclose the individual premia paid in the individual transactions so that investors can find outliers

for themselves.  Without this information, it is impossible to determine whether Goldman Sachs'

selected range of "illustrative premia of 25% - 45% to the Gannett Undisturbed Closing Price of $7.90" is a fair and accurate representation of the premia paid in the precedent transactions.

94.    If a proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).   Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.   Thus, Defendants' omission renders the projections disclosed in the Registration Statement misleading.

95.    In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

96.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

97.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use

of the mails or by any means or instrumentality of interstate commerce or of any facility of a national

securities exchange or otherwise, in contravention of such rules and regulations as the Commission

may prescribe as necessary or appropriate in the public interest or for the protection of investors, to

solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of

any security (other than an exempted security) registered pursuant to section 78l of this title."  15

U.S.C. § 78n(a)(1).

98.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act,

provides that proxy communications shall not contain "any statement which, at the time and in the

light of the circumstances under which it is made, is false or misleading with respect to any material

fact, or which omits to state any material fact necessary in order to make the statements therein not

false or misleading."  17 C.F.R. § 240.14a-9.

99.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9

if other SEC regulations specifically require disclosure of the omitted information.

100.   Defendants have issued the Registration Statement with the intention of soliciting the

Company's common shareholders' support for the Proposed Transaction.  Each of the Individual

Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to

provide critical information regarding the valuation analyses performed by the Company's Financial

Advisors in support of its fairness opinion.

101.   In so doing, Defendants made untrue statements of fact and/or omitted material facts

necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue

of their roles as officers and/or directors, were aware of the omitted information but failed to disclose

such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent,

as they had reasonable grounds to believe material facts existed that were misstated or omitted from

the Registration Statement, but nonetheless failed to obtain and disclose such information to the

Company's shareholders although they could have done so without extraordinary effort.

102.   The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

103.   The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration

Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

104.   The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

105.   The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

106.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

107.   The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

108.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior

to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

109. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

110. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

111. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

112. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

113. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 30, 2019

**Monteverde & Associates PC**
By:    */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite
4405 New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**
**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
      jfruchter@ademilaw.com

*Attorneys for Plaintiff*